**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.:

JOSHUA MORRELL,

      Plaintiff,

      v.

ALLAN BLANCO; in his individual capacity;
JONATHAN TOPPER; in his individual capacity;
CORECIVIC, INC., a corporation;

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Joshua Morrell, by and through counsel Nicholas A. Lutz of RATHOD |

MOHAMEDBHAI LLC and Michael Fox of Kalamaya | Goscha, respectfully alleges for his

Complaint and Jury Demand as follows:

### NATURE OF THE ACTION

On April 26, 2019, Defendant Allan Blanco, an employee of Defendant CoreCivic, Inc.

(CoreCivic), pepper-sprayed Plaintiff Joshua Morrell who was incarcerated at the time. Defendant

Blanco pepper-sprayed Mr. Morrell from less than two-feet from his face without justification,

causing Mr. Morrell to suffer severe physical and emotional pain. After being pepper-sprayed,

Defendant Blanco, Defendant Topper, and all other CoreCivic employees failed to provide Mr.

Morrell a decontamination shower, which greatly exacerbated and prolonged Mr. Morrell's

suffering. Defendant CoreCivic is responsible for these violations for its failure to train and/or

supervise its employees, including Defendant Blanco and Defendant Topper, and these violations

are pursuant to its pattern, practice, and/or custom of failing to train and/or supervise its employees as to appropriate use of force, the proper use of pepper spray, and proper decontamination following the use of pepper spray.

## II.  JURISDICTION AND VENUE

1.      Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343.  This action is authorized and instituted pursuant to 42 U.S.C. § 1983.  Supplemental jurisdiction is proper pursuant to 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the supplemental state cause of action derives from a common nucleus of operative facts. Jurisdiction supporting the claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All acts and/or omissions alleged herein to be unlawful were committed within the District of Colorado, and at the time of the events giving rise to this litigation, all of the parties resided in Colorado.

## III.  PARTIES

3.      At all pertinent times mentioned herein, Plaintiff Joshua Morrell was a resident of and domiciled in the State of Colorado.

4.      At all times relevant to this Complaint, Defendant Allan Blanco was a resident of the State of Colorado and was acting under color of state law in his capacity as a Corrections Officer employed by CoreCivic, Inc., at Crowley County Correctional Facility.

5.      At all times relevant to this Complaint, Defendant Jonathan Topper was a resident of the State of Colorado and was acting under color of state law in his capacity as a Captain employed by CoreCivic, Inc., at Crowley County Correctional Facility.

6.      Defendant CoreCivic, Inc. (formerly known as Corrections Corporation of America, Inc.) is a Maryland corporation registered to transact business in Colorado, transacting business in Colorado and available for service of process via registered agent C T Corporation System, 7700 E Arapahoe Rd. Ste. 220, Centennial, CO 80112-1268.  CoreCivic, Inc. is a private corrections management company that manages prisons, jails, and detention facilities, including Crowley County Correctional Facility.

## IV. FACTUAL ALLEGATIONS

### A.  CoreCivic and Crowley County Correctional Facility

7.      Defendant CoreCivic is a private, for-profit corporation that manages approximately 115 prisons, detention centers, and jails throughout the United States.

8.      Crowley County Correctional Facility (CCCF) is one of Colorado's two private prisons and has been owned and operated by CoreCivic since 2003.

9.      CCCF is a medium security facility with a population capacity of 1,850.

10.     CoreCivic operates CCCF through a contract for services with the Colorado Department of Corrections (CDOC).

11.     CDOC oversees the CoreCivic facilities it contracts with through the Private Prisons Monitoring Unit (PPMU).

12.     The PPMU exists to ensure that private contract prisons are in compliance with CDOC policies, contract specifications, and American Correctional Association standards. The provisions of each contract stipulate that CDOC training requirements as well as food, medical, educational, and other service requirements are met.

13.     Though a private entity, CoreCivic is governed by CDOC's administrative regulations and is subject to CDOC oversight through the PPMU.

14.     At all relevant times, CoreCivic was performing a traditional state function by operating CCCF.

**B. Defendant Allan Blanco Sadistically and Maliciously Pepper Sprayed Mr. Morrell without Penological Purpose**

15.     Plaintiff Joshua Morrell was incarcerated at CCCF from approximately April 2017 until February 2020.[1]

16.     On April 26, 2019, Mr. Morrell resided in the A-Pod of CCCF Unit 4A.

17.     The same day, when Defendant Blanco reported for work, CoreCivic staff allowed him to check out weapons from the facility's equipment storage area, including a can of MK-9 Oleoresin Capsicum (OC)[2] spray.

18.     When Defendant Blanco obtained the MK-9 OC spray his certification for that weapon was expired.

19.     Pursuant to CDOC policy, Defendant Blanco should not have been permitted to carry OC spray.

20.     Other CoreCivic staff did not require Defendant Blanco to demonstrate that he was certified to use OC spray before he obtained the MK-9 OC spray from the facility and other

---

[1] Mr. Morrell was released from CDOC custody to parole in 2020. Mr. Morrell successfully completed and discharged his parole in December 2020.

[2] Oleoresin Capsicum, also known as "pepper spray," is liquid spray made with substances occurring in the resin of cayenne and other peppers that severely irritates nerve endings near the surface of the skin causing a burning sensation and substantial pain.

CoreCivic staff permitted Defendant Blanco to carry it on his belt and use it at his discretion in the performance of his duties.

21.     On April 26, 2019, at approximately 6:30 p.m., Mr. Morrell and other inmates gathered to walk to dinner in CCCF's East Dining Hall.

22.     In order to access the East Dining Hall, Mr. Morrell and the group had to walk across an outdoor yard that separates CCCF's East and West units. This yard is called the East yard.

23.     At that time, Defendant Blanco was assigned to CCCF Unit 3, which is positioned directly across the East yard from Unit 4.

24.     While Mr. Morrell and the other inmates crossed the yard, Defendant Blanco was stationed near a bathroom directly across from them.

25.     As Mr. Morrell and the other inmates crossed the yard, a medical emergency occurred somewhere in the facility.  An alert went out over the CCCF radio calling for staff to respond to the site of the emergency.

26.     At approximately the same time, Defendant Blanco entered the East yard and began to approach Mr. Morrell and the other inmates.

27.     Defendant Blanco yelled to the group words to the effect of "Hey you, get the fuck back here!"

28.     Mr. Morrell responded to Defendant Blanco and told him, "You don't have to talk to us like that."

29.     Defendant Blanco responded, "Who the fuck do you think you're talking to?" and then quickly and aggressively approached Mr. Morrell.

30.     Mr. Morrell told Defendant Blanco to "calm down" and asked Defendant Blanco to call a shift commander.

31.     In response, Defendant Blanco told Mr. Morrell words to the effect of "shut the fuck up or I'll shove this whole can down your throat!" referring to the MK-9 OC spray he was carrying.

32.     Mr. Morrell again asked Defendant Blanco to call a shift commander.

33.     Defendant Blanco did not call a shift commander.

34.     Mr. Morrell had not moved toward Defendant Blanco or made any threatening movements or gestures of any kind, and Mr. Morrell was physically separate from the other inmates in the area.

35.     Defendant Blanco then drew the cannister of OC spray from his belt and pointed it at Mr. Morrell, while simultaneously shouting to him words to the effect of "what are you going to do now bitch?"

36.     Defendant Blanco then ordered Mr. Morrell to place himself against a nearby fence.

37.     Mr. Morrell immediately complied with Defendant Blanco, turned around and moved against the fence, his back now turned to Defendant Blanco.

38.     Defendant Blanco did not tell Mr. Morrell to remain facing the fence.

39.     Defendant Blanco then moved behind Mr. Morrell within a distance of less than two feet.

40.     As Mr. Morrell turned around to face Defendant Blanco, Defendant Blanco shoved Mr. Morrell into the fence and then – from less than two feet away – deployed the OC spray directly into Mr. Morrell's eyes, nose, mouth, throat, and face.

41.     Mr. Morrell immediately screamed out in pain as the OC spray began to saturate his eyes, nose, mouth, throat, and lungs as well as burn his skin.

42.     Mr. Morrell fell to his knees and continued to scream for Defendant Blanco to stop the spray.  Nevertheless, Defendant Blanco continued to discharge the OC spray at Mr. Morrell's face for several seconds, even as Mr. Morrell was collapsed to his knees and incapacitated.

43.     Many of the other inmates nearby, shocked and horrified by Defendant Blanco's conduct, pleaded with him to stop spraying Mr. Morrell.

44.     Still, as was later confirmed by witnesses, Defendant Blanco deployed the OC spray at Mr. Morrell for approximately eight seconds, despite Mr. Morrell's incapacitation.

45.     The OC spray permeated Mr. Morrell's eyes, nose, mouth, and throat, causing a severe burning sensation and severe pain throughout the affected areas and over his skin.

46.     Once Defendant Blanco ceased spraying Mr. Morrell in the face with the OC spray, he used his radio to call for back up and then handcuffed Mr. Morrell.

47.     Mr. Morrell continued to be entirely physically compliant and continued to comply with Defendant Blanco's orders.

48.     As Defendant Blanco placed Mr. Morrell in handcuffs, Defendant Jonathan Topper, a CoreCivic Shift Supervisor, and Correctional Officer Tristan Ross arrived at the scene.

49.     Mr. Morrell pleaded with Defendant Topper and Officer Ross to get Defendant Blanco away from him.  Mr. Morrell, still gasping from the effects of the OC spray in his lungs, called out to the officers that he was unsafe, hurt, and needed to be taken to the medical unit.

50.     Defendant Topper responded to Mr. Morrell that he was "being taken to seg."

51.     One of the officers separated Defendant Blanco from Mr. Morrell and told him to leave the area.  Both Defendant Topper and Officer Ross then picked up Mr. Morrell by his arms and led him back into the facility.

52.     As he was being escorted to the facility, Mr. Morrell begged to be taken to a decontamination shower so that he could remove his OC spray-soaked clothes and wash the still burning substance from his body.  Defendant Topper responded that Mr. Morrell would get a shower after he was placed in a segregation cell.

53.     Video of the entire incident was captured on a CCCF video surveillance system.

54.     At all times prior to Defendant Blanco spraying Mr. Morrell with OC, Mr. Morrell was physically compliant with Defendant Blanco's orders.

55.     At no time prior to Defendant Blanco spraying Mr. Morrell with OC did Mr. Morrell approach or get closer to Defendant Blanco.

56.     At the time Defendant Blanco sprayed Mr. Morrell with OC, Mr. Morrell presented absolutely no threat of harm to Defendant Blanco or others.

57.     No penological purpose existed to justify the use of OC spray against Mr. Morrell.

58.     No penological purpose existed to justify *any* force against Mr. Morrell.

### C. Defendant Topper and CoreCivic Personnel Failed to Provide Mr. Morrell with a Decontamination Shower After the Attack

59.     Following the incident, Mr. Morrell was initially taken to CCCF's medical unit, where he remained for several hours.

60.     Mr. Morrell remained handcuffed and covered in his OC spray-soaked clothing, which continued to cause a burning sensation and severe pain to his skin for hours.

61.     Despite his knowledge of the attack and of Mr. Morrell's need for a decontamination shower to stop the ongoing pain, Defendant Topper—the Shift Commander at the time—refused to provide or to ensure that Mr. Morrell received a decontamination shower.

 

*Mr. Morrell After Being Sprayed with Oleoresin Capsicum*

62.     Mr. Morrell repeatedly requested to be provided with a decontamination shower because he was in continuing pain.  CoreCivic staff told him that he would receive a shower later. Despite these assurances, CoreCivic staff held Mr. Morrell in the medical unit for approximately eight hours without allowing him to take a decontamination shower.

63.     While in the medical unit, Mr. Morrell was able to briefly spray water in his face. However, this was insufficient to clear the OC spray from Mr. Morrell's eyes.  Mr. Morrell's face and eyes continued to experience a burning sensation.

64.     Mr. Morrell continued to request a decontamination shower and continued reporting the pain he was experiencing to the staff members that were present.

65.     Defendant Topper refused for hours to provide or to ensure Mr. Morrell was provided a decontamination shower, despite his knowledge of Mr. Morrell's pain and his need for a shower.

66.     At approximately 2:30 a.m., Mr. Morrell was transferred to a single-person administrative segregation cell.

67.     Mr. Morrell remained in the segregation cell for a period of at least two days. CoreCivic staff did not allow him a decontamination shower during this time.

68.     During that time, his body remained coated in OC spray which continued to cause a burning sensation and severe pain.

69.     While Mr. Morrell remained in his cell and continued be affected by the OC spray, CoreCivic employees did not provide him with any means of removing the OC residue from his body or clothing.   For days, Defendant Topper failed to provide or to ensure Mr. Morrell was provided a decontamination shower, despite his knowledge of Mr. Morrell's pain and his need for a shower.

70.     For two days, Mr. Morrell continued to suffer severe burning sensations and severe pain through his eyes, mouth, throat, and nose, as well as the areas of his skin that had been exposed to the OC.

71.     CCCF's own records regarding the incident indicate that CoreCivic employees did not provide Mr. Morrell with a decontamination shower.

72.     As the shift supervisor on duty on April 26, 2019, it was Defendant Topper's responsibility to ensure that any inmate exposed to OC spray, including Mr. Morrell, received a decontamination shower.

73.     Defendant Topper failed in his duty to ensure that Mr. Morrell was adequately decontaminated.

74.     Defendant Topper's actions or omissions in failing to ensure that Mr. Morrell was adequately decontaminated caused Mr. Morrell harm in addition to Defendant Blanco's initial deployment of OC spray on Mr. Morrell.

75.     While Mr. Morrell was incarcerated in an administrative segregation cell, he requested a shower and a change of clothes from multiple staff members with which he came into contact.  None of these staff members meaningfully responded to his numerous requests.

76.     While Mr. Morrell suffered in isolation without a shower or other means of decontamination, each and every CoreCivic employee that he came into contact with knew or should have known that depriving Mr. Morrell of a means of decontamination would and, in fact, did cause him substantial physical and emotional harm.

**D.  CDOC and PPMU Determined that Defendant Blanco's Use of Force was Unwarranted and Excessive**

77.     Following the incident, both CoreCivic and CDOC investigated Defendant Blanco's use of force.

78.     CDOC determined that Defendant Blanco's use of force was not necessary, reasonable, appropriate, or justified.

79.     Indeed, Defendant Blanco's use of force was not applied in accordance with CDOC departmental policy.

80.     Defendant Blanco's use of force was excessive.

81.     Defendant Blanco was not in the appropriate "stand-off" distance of six feet for the use of MK-9 OC spray when he sprayed Mr. Morrell.

82.     Defendant Blanco failed to call for additional staff prior to using force, in violation of CDOC policy.

83.     Defendant Blanco failed to clear the area of other inmates before using OC spray, in violation of CDOC policy.

84.     Defendant Blanco failed to follow the departmental Use of Force Continuum, in violation of CDOC policy.

85.     Defendant Blanco's OC certification was expired, and he should not have been carrying OC spray, pursuant to CDOC policy.

86.     Defendant Blanco's use of force was not proportionate to Mr. Morrell's conduct.

87.     Defendant Blanco had numerous alternatives at his disposal short of using OC spray or any force at all.

88.     Defendant Blanco was unprofessional with his language.  This was corroborated by other CoreCivic employees.

89.     All of the above acts of misconduct and policy violations are corroborated by CDOC's own investigative findings.

90.     Moreover, not only did Defendant Blanco commit numerous policy violations in using excessive force against Mr. Morrell, Defendant Blanco was untruthful in his reporting of the incident.

91.     Indeed, Defendant Blanco omitted several key details of the encounter in his reports, including that he had antagonized, insulted, and cursed numerous times at Mr. Morrell.

92.     Lt. Gary Myers of the PPMU concluded that Defendant Blanco's written statement did not appear to accurately account for all environmental factors leading to the use of force, including Defendant Blanco's use of profane language.

93.     Defendant Blanco lied in his reporting of the incident by falsely claiming that Mr. Morrell lunged at him prior to deploying the OC spray.

94.     While Defendant Blanco claimed that Mr. Morrell advanced towards him prior to him spraying Mr. Morrell with OC, he later admitted to Lt. Danielle Lipsey that Mr. Morrell did not advance towards him.

95.     Following the incident, Defendant Blanco told another officer, "I sprayed that mother fucker!"

**E.    CoreCivic Permitted Defendant Blanco to Carry and Use MK-9 OC Spray with an Out-of-Date Training Certification and Failed to Follow Reporting Requirements After the Incident**

96.     At the time he used OC spray against Mr. Morrell, Defendant Blanco's certification for the weapon was expired by approximately 10 weeks.

97.     CoreCivic employees, including Defendant Topper who was the Shift Commander at the time of the incident, permitted Defendant Blanco to carry his MK-9 OC Spray for approximately 2.5 months, despite the fact that his certification for the use of OC spray was out of date.

98.     Following Defendant Blanco's assault of Mr. Morrell, CoreCivic supervisors—including Defendant Topper—failed to follow Colorado Department of Corrections' policy regarding use of force reporting.

99.     Defendant Blanco's supervisor, Defendant Topper, failed to complete an Administrative Regulation Form 300-16 Intensive Supervision Log. These logs help to ensure that use of force is appropriate and any problems with a use of force are documented and addressed.

100.     Defendant Topper was on duty when Defendant Blanco sprayed Mr. Morrell with OC and, as shift supervisor, was responsible for reporting and documenting both the incident and the facility staff's response.

101.     Defendant Topper—not Defendant Blanco—completed the Administrative Regulation Form 300-16RDA, which is not in accordance with CDOC policies or best practices. CDOC policy requires the individual who used the force to complete such record.

102.     In reporting Officer Blanco's use of force, Defendant Topper concluded that Officer Blanco's actions were necessary to restrain and/or effect the arrest of Mr. Morrell.

103.     But as all investigators later found, such a conclusion is patently false given Mr. Morrell's compliant behavior prior to the use of force.

**F.  CoreCivic Maintains a Custom, Policy, Pattern, and Practice of Excessive Force and Excessive Use of OC Spray**

104.     CoreCivic maintains longstanding a custom, policy, and/or practice of allowing its employees to engage in excessive force.

105.     CoreCivic similarly maintains a longstanding custom, policy, and/or practice of allowing its employees to use OC spray in an excessive and unjustified manner.

106.     In March 1999, CoreCivic (then Corrections Corporation of America) settled a class action lawsuit filed by prisoners at CoreCivic's Northeast Ohio Correctional Center. Plaintiffs alleged a pattern of excessive force including unnecessary teargassing.  CoreCivic admitted no wrongdoing in the matter.

107.    In 2000, a South Carolina jury found that CoreCivic (then Corrections Corporation of America), had an official policy and/or custom that led to the unwarranted hog tying and pepper spraying of a juvenile at one of its South Carolina facilities.

108.    In 2013, prisoner Timothy Groce settled his *pro se* lawsuit with CoreCivic (then Corrections Corporation of America) wherein Groce had made a disrespectful comment to Guard James McVey.   In response, McVey yanked Groce's arm through slot in a cell door causing bruising and threatened to pepper spray him.

109.    In 2017, a Nashville-based CoreCivic employee, Oluwatobi Ola, unnecessarily pepper sprayed prisoner James Nelson.   During the internal investigation it was determined that Ola—like Defendant Blanco—lied in his reporting of the incident.   The incident was captured by video and Ola was later criminally charged for his conduct.

110.    In 2017, Tennessee CoreCivic employees pepper sprayed an inmate who was found hanging in his cell following a suicide attempt. The incident was brought to light by former CoreCivic Chaplain Jacque Stuebbel who reported:

> They told me, 'You can't go in there, chaplain.'  And I said, 'Yes I can.'  And I went in there and here's a man hanging and they're spraying him with pepper spray . . . . I'm holding his hand and it's covered in pepper spray. And he happened to be Muslim.  I said, 'Brother, I'm with you.  You're not alone.'  And he was covered with pepper spray and he was not a threat.  I mean, when you're dangling like this, that's the response.  Spray them.

111.    Correctional Administrator Tony Howard agreed with Chaplain Stuebbel and reported, "The inmate in my opinion was already compliant . . . but he was sprayed."

112.    In February 2017, inmate Dana Palmer was killed when a CoreCivic staff member pepper sprayed her after she had swallowed contraband.

113.    Over a ten-month span in approximately 2017, pepper spray was used 102 times at the CoreCivic-operated Trousdale Turner Correctional Facility. The next-highest number of incidents at a Tennessee facility was seven total pepper spray incidents over the same period.  Even when accounting for the difference in population, the use of pepper spray against inmates at the CoreCivic facility was disproportionately high.

114.    In Tennessee as of 2017, the five facilities with the highest use of pepper spray were all CoreCivic-operated facilities.

115.    In 2020, CoreCivic attempted to require prisoners at its Otay Mesa Detention Center to sign liability waivers before it would provide them with face masks designed to prevent the spread of COVID-19. Some of those prisoners were threatened with pepper spray after they planned to stage a hunger strike in protest of the waiver requirement.

116.    On April 11 and 13, 2020, staff at CoreCivic owned and operated La Palma Correctional Center unnecessarily deployed pepper spray on a large group of inmates engaged in a peaceful protest. This incident was investigated and documented by the Department of Homeland Security Office of Inspector General.



**Figure 2. LPCC staff firing pepper spray and chemical agents at detainees in an LPCC housing area on April 13, 2020.**
*Source:* Video surveillance footage provided by LPCC staff

> *Photo Excerpt from March 30, 2021 Office of Inspector General Report Concerning Violations of Detention Standards at La Palma Correctional Center*

117.    182 prisoners at CoreCivic owned and operated La Palma Correctional Center signed a letter stating that La Palma Correctional Center staff used chemical agents, including pepper spray and pepper balls, to quell protests in 2020.

118.    These April 2020 incidents alone unnecessarily exposed hundreds of inmates under CoreCivic's care and management to pepper spray or similar chemical agents.

119.    Between February 1, 2020 and August 24, 2020, chemical agents were used by staff in 11 of the 27 use of force incidents in CoreCivic owned and operated La Palma Correctional Center.

120.    In July 2020, a large group of protesting migrants was unnecessarily pepper sprayed *en masse* by staff at the Torrence County Detention Facility in New Mexico, which is operated by CoreCivic.

121.   CoreCivic has defended its staff's use of OC spray on non-violent, passive, protestors and has not admitted wrongdoing by its officials in any of these incidents.

122.   CoreCivic has created and fostered a culture in which its employees routinely use excessive force, especially chemical agents like OC spray, against non-threatening inmates.

123.   Defendant Topper's inexplicable approval of Defendant Blanco's actions here is another example of the custom within CoreCivic of tolerating excessive force against inmates.

124.   Moreover, CoreCivic's months-long practice of allowing Defendant Blanco—and likely others—to check out and wield a weapon without having the proper training or certification to ensure its safe and appropriate use is a further example of systemic indifference to ensuring appropriate use of force.

125.   This culture has also emboldened CoreCivic employees to lie or misrepresent use of force incidents in their reports, as Defendant Blanco did here. This practice causes many instances of unjustified use of force to escape the notice and scrutiny of prison monitors like the PPMU.

## V. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Eighth and Fourteenth Amendments**
**Excessive Force**
**(Against Defendants Blanco and Topper)**

126.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

127.   Plaintiff had a constitutionally protected and clearly established right to be free from excessive force amounting to cruel and unusual punishment.

128.     Defendants unlawfully inflicted unnecessary and wanton pain on Plaintiff by means of excessive physical force and thereby committed cruel and unusual punishment against him.

129.     Defendants' actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

130.     Defendants' actions, as described above, were undertaken maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline.

131.     Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

132.     Defendants' conduct violated clearly established rights belonging to Plaintiff, of which reasonable correctional officer knew or should have known.

133.     Plaintiff has been and continues to be damaged by Defendants' use of excessive force against him.

134.     The acts or omissions of each Defendant were the legal and proximate cause of Plaintiff's damages.

135.     As a direct result of Defendants' unlawful action as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

136.     Defendants Blanco and Topper, at all relevant times hereto, were acting under the color of state law in their capacities as correctional officers.

137.     The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Defendant CoreCivic, which encourages, condones, tolerates, and ratifies the use of excessive force by its correction officers at CCCF and at its facilities nationwide.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Train or Supervise, *Monell* Liability**
**(Against Defendant CoreCivic)**

138.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

139.    Defendant CoreCivic failed to properly train and supervise its employees to protect inmates and avoid the use of excessive force.

140.    Defendant CoreCivic knew, or should have known, that its employees would fail to maintain up-to-date chemical weapons training, employ de-escalation and the use-of-force continuum, and use reasonable force, violating inmates' constitutional rights.

141.    Defendant CoreCivic's failure to adequately monitor, safeguard, and respond to inmates who are suffering the effects of chemical agents, including OC spray, and excruciatingly painful injuries is a custom, policy, or practice of Defendant CoreCivic and a driving force behind Mr. Morrell's constitutional violations as described herein.

142.    Defendant CoreCivic was deliberately indifferent to the constitutional rights of CCCF inmates, and inmates nationwide, knowing that its employees routinely, continuously, and repeatedly engage in excessive force and specifically excessively deploy OC spray against inmates without cause.  Defendant CoreCivic was deliberately indifferent to the consequences that could be suffered by such inmates, including Mr. Morrell, by failing to properly monitor, train, supervise, discipline, and timely discipline its employees for such excessive force.  Defendant CoreCivic could have and should have pursued monitoring, training, and supervising of such employees, but failed to do so here and in many other circumstances before this incident.

143. Defendant CoreCivic's policies, customs, or practices in failing to properly monitor, train, supervise, and discipline its employees were the moving force and proximate cause of the violation to Mr. Morrell's constitutional rights.

144. The custom, policy, and practice of Defendant CoreCivic of encouraging, condoning, tolerating, and ratifying of the failure to monitor and protect inmates; failures to monitor, train, supervise, discipline, and timely discipline employees; and the use of excessive force by correctional officers at CCCF and other CoreCivic facilities, as described herein, was the moving force behind and proximate cause of the violation of Mr. Morrell's constitutional rights.

145. The acts or omissions of Defendant CoreCivic caused Mr. Morrell damages in that he suffered extreme physical and mental pain during the assault by Defendant Blanco and a severe burning sensation on his skin, face, eyes, nose, and mouth that lasted over a period of approximately two days while CoreCivic employees refused to let Mr. Morrell decontaminate.

146. The actions of Defendant CoreCivic as described herein deprived Mr. Morrell of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

**THIRD CLAIM FOR RELIEF**
**Negligence**
**(Against Defendant CoreCivic)**

147. CoreCivic is a private corporation that contracted with CDOC to provide correctional services and care services to people incarcerated at CCCF.

148. CoreCivic is vicariously liable for the negligent acts and omissions by its agents and/or employees, including but not limited to, Defendants Blanco and Topper.

149.     At all times relevant to this Complaint, Mr. Morrell was under the responsibility, care, and treatment of CoreCivic and its employees.

150.     CoreCivic and its staff had a duty to provide care to and to ensure the safety of people incarcerated at CCCF, including Mr. Morrell.

151.     With respect to their care of Mr. Morrell, CoreCivic's employees owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of personnel in similar situations.  Through their actions and omissions, CoreCivic and its employees breached their respective standards of care and were negligent in failing to train their employees to refrain from using excessive force, failing to ensure their employees, including Defendant Blanco, were trained on the appropriate use of weapons including OC spray, failing to ensure that their employees including Defendant Blanco were certified to carry weapons including OC spray, and failing to provide Mr. Morrell with a decontamination shower, causing him to languish in pain for a period of days.

152.     CoreCivic also had a duty to implement reasonable policies and exercise reasonable care in the training of its employees at CCCF.  CoreCivic breached its duty to exercise reasonable care in the training of its employees in a manner that would ensure inmates exposed to pepper spray would be appropriately treated and provided with adequate means of decontamination.

153.     As a direct and proximate result of these Defendants' unlawful acts and omissions, Mr. Morrell has suffered damages, losses, and injuries in an amount to be determined by the jury at trial.  These damages include emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering, and all other damages allowed under the law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Morrell requests the Court enter judgment for the following relief:

(a)  All appropriate relief at law and equity;

(b)  Declaratory relief and other appropriate equitable relief;

(c)  Economic losses on all claims as allowed by law;

(d)  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)  Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g)  Pre- and post-judgment interest at the appropriate lawful rate; and

(h)  Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully Submitted: April 20, 2021

<div style="margin-left:50%">

RATHOD | MOHAMEDBHAI LLC

*s/ Nicholas A. Lutz*
Nicholas A. Lutz
2701 Lawrence St., Suite 100
Denver, CO 80205

</div>

(303) 578-4400 (t)
(303) 578-4401 (f)
nl@rmlawyers.com


Kalamaya | Goscha

*s/ Michael Fox*
Michael Fox
202 8th Street, Suite 1
Glenwood Springs, CO 81601
(970) 305-3794 (t)
michael@kalamaya.law


ATTORNEYS FOR PLAINTIFF